## Case No. 14,045.

### TILGHMAN et al. v. TILGHMAN.

[1 Baldw. 464.] [1]

Circuit Court, D Pennsylvania. April Term, 1832.

EQUITY—REFORMATION OF CONTRACTS—PLEADINGS —MARRIAGE CONTRACT—WIFE'S PORTION— ADMISSIONS IN ANSWER—EXECUTOR.

1. Equity will not enforce a contract which is not definite and precise in its terms, or reform a written contract by a previous one by parol on the same subject; any variance will be presumed to have arisen from a change of intention, in the absence of fraud, mistake or accident.

2. The writing must recite or refer to something by which to reform it, or there must be some matter of higher authority than the writing to authorize it

3. If a paper deliberately agreed upon to effect an object, fails to do so by the death of the party who was to do the necessary act, equity will not give a remedy by setting up a previous agreement.

4. A party must rely on the case stated in his bill or answer; if he sets out a contract in writing, he cannot recover on a verbal one not set up in the bill or answer.

5. Equity will not construe a marriage contract differently from its terms, in favour of the parties to the marriage, though they would do it in a similar case in favour of the issue.

6. By an agreement in consideration of an intended marriage, the portion of the wife was to be raised out of her real estate of which her father was tenant by the curtesy, by a sale after she arrived at twenty-one; the marriage took effect; the wife attained twenty-one, and died two months afterwards, without any act done by her towards the completion of the settlement, or any request by the husband to the father to have it done. Held, that as the act must be a concurrent one, the party who claims a remedy for non performance must aver and prove performance, or an offer and readiness to perform, on his part.

7. Where no time is fixed in the contract, the party desirous of performance must hasten it by a request. That none being made after the wife came of age, the father or his estate was not liable for the non performance.

8. A general allegation in a bill against an executor, that he retains the money of the estate in virtue of a pretended debt, claimed from the testator by a pretended contract which the bill denies, and the prayer of the bill is generally for an answer to the matters charged therein, does not make the answer of the executor evidence to support such debt, when he admits there is money of the estate in his hands, for which he must account if he does not establish the debt.

9. An answer denying the right of a complainant is evidence in favour of a defendant. But if he admits the right, and sets up new matter in bar: if he admits the charge, and avers a discharge at a different time by a distinct transaction, or sets up an affirmative claim in his own right to the subject matter claimed by the complainant, it is not evidence in his favour; the defendant must make out his case as a plaintiff ought to do.

[Cited in Reid v. McCallister, 49 Fed. 17.]

This case arose on a bill filed by the complainants, who were legatees under the will

[1] [Reported by Hon. Henry Baldwin, Circuit Justice.]

of the late Chief Justice Tilghman, against E. S. Burd and Benjamin Chew, Jr., Esquires, his executors, praying for an account of his estate and payment of their legacies out of the surplus.

Separate answers were filed by the executors, Mr. Burd admitting a balance on hand for distribution among the legatees, Mr. Chew claiming a right to retain it for a debt due him by the testator. The existence of this debt was the only matter in controversy. By the will the testator devised the residue of his estate to his grandson, the son of the defendant, Chew, and the testator's only daughter and child, in full property; in case of the death of the grandson before twenty-one and without issue, among other bequests was the following, "My son-in-law, Benjamin Chew, Jun., if living at the time of the death of my grandson as aforesaid, shall have for his own use 5000 dollars lawful money aforesaid, in addition to the sum of 10,000 dollars to which he is at all events entitled at my death in right of his late wife, by virtue of a bond which I gave her in my lifetime." Legacies were also given to the complainants.

The will was dated the 16th of October, 1819; the grandson died the 6th of April, 1820, under age and without issue; the testator died the 29th of April, 1827, without having altered his will, of which the defendants took the administration. The legacy of 5000 dollars and the post obiit bond of 10,000 dollars were received by Mr. Chew before filing the bill.

After reciting the will, &c., the bill proceeds in the usual form and concludes with the following charge and prayer.

"But now, so it is, may it please your honours, that the said Benjamin Chew, Jun. and Edward S. Burd, combining and confederating with others, to your orators unknown, whose names, when discovered, they pray leave to insert, with apt words to charge them as parties, pretend that the said personal estate of the testator, and the proceeds of the sale of the real estate are not more than sufficient to pay and satisfy his funeral expenses, debts and legacies, by reason of an alleged debt to a very large amount, claimed to be due from the testator to the said Benjamin Chew, Jun., one of the said executors, upon a certain pretended contract or agreement entered into between the testator in his lifetime and the said Benjamin Chew, Jun. Whereas your orators charge that the testator never did enter into any such contract or agreement as is pretended, and that no debt is in law or equity due to the said Benjamin Chew, Jun., by virtue of the said pretended contract or agreement, or in any other manner whatever; or, that if the testator did ever enter into any such contract or agreement as is pretended, it was satisfied in his lifetime or by bequests and devises to the said Benjamin Chew, Jun. in his will, which the said

Benjamin Chew, Jun. has accepted. And the said executors do refuse to come to a just and fair account with your orators for the personal estate of the testator, and the proceeds of the sales of the real estates aforesaid, in order that the clear residue of the testator's estate may be ascertained, and to pay over to your orators such proportion of the same as they are entitled to receive under the directions of the said will. All which actings and doings of the said executors are contrary to equity and good conscience, and greatly to your orators' prejudice. In consideration whereof, and forasmuch as your orators cannot have plain, adequate and competent remedy at law, to the end therefore that the said executors and their confederates, when discovered, on their oaths or affirmations, full, direct and true answers may make to all and singular the matters and things hereinbefore set forth as if they had been particularly interrogated thereon; and that they may render and set forth a just and true account of all and singular the personal estate of the said testator, and of the moneys arising from the sale of the said real estate, and pay over to your orators such proportion of the clear residue of the testator's estate as they are entitled to receive under the directions of the said will; and that your orators may have such further relief in the premises as is consistent with equity and good conscience, and as to this honourable court shall seem meet."

As it was admitted that the executors had faithfully administered, and accounted for all the estate which came to their hands, it is not deemed necessary to refer to the answer of Mr. Burd, or to any other part of that of Mr. Chew, except what relates to the debt claimed to be due to him by the testator, which is as follows:

"And this defendant further shows for answer to the complainants' said bill the following facts and circumstances, which, as he is advised and believes, clearly manifest the existence of a heavy debt due to him from the said testator. and justify and require the appropriation of any funds which may be in the hands of the defendants as executors in discharge thereof.

"Previously to the intermarriage of this defendant, the terms and conditions upon which the marriage should take place were treated of, and an arrangement was made between the said testator, this defendant, and his father, Benjamin Chew, Esq.. whereby it was mutually promised and agreed that the latter should give to this defendant, on the said marriage, land in fee simple valued at 5000 dollars, and allow him the interest of 25,000 dollars annually. And the said William Tilghman would give for the advancement of his daughter in the said marriage 30,000 dollars. And he further declared and promised to this defendant, and to his said father, that he, the said Wil-

liam Tilghman, would do on the occasion of the said marriage whatever the said Benjamin Chew the elder would do, and more.

"On the day previous to the said marriage the testator aforesaid exhibited and presented to this defendant a paper in the proper handwriting, and with the proper signature of the said William Tilghman, and received the assent in writing of this defendant to the same. The fourth schedule, hereto annexed, as part of this answer, is a true copy of the said paper and assent, and the original is ready to be produced to this honourable court.[2]  On the 11th day of July, 1816, the said marriage accordingly took place.  The said testator afterwards declared to the defendant's said fa-

[2] Philadelphia, July 10, 1816.  My Dear Sir,—As my daughter, to whom you are to be married is under age, I think proper to mention what I propose to be done after she arrives at twenty-one; and from the conversation we have recently had, I make no doubt but it will be agreeable to you  In order to procure an income we must resort to the Northampton estate, which, although valuable, is unproductive in its present state.  I intend that so much of it shall be sold as will produce 30,000 dollars, of which 5000 may be expended in furniture, and the remaining 25,000 placed in your hands, to be used by you as you think proper.  This capital of 25,000 dollars is to be considered, after your death, as a debt due from your estate.  If your wife survives you she is to receive it from your estate, and if she dies before you she is to have the right of disposing of it as she pleases, either by last will and testament, or any writing in nature thereof, or any other writing executed in the presence of at least two witnesses, during her coverture; but if she should die without making any such disposition, then, after your death, the said 25,000 dollars is to be distributed according to the law of Pennsylvania, in the same manner as it would be if your wife had died possessed of it and unmarried.  Provided, that if it should be made to appear by any books, writings or papers of yours, in what property, real or personal, the said 25,000 dollars stand invested at the time of your death, then, instead of that sum being considered as a debt against your estate, the specific property shall go to your wife, if she survives you absolutely; or in case she dies before you, be subject to her disposition as aforesaid; and if she makes no disposition thereof, it shall descend or be distributed, according to its nature, in the same manner as if she had died seised and possessed of it unmarried.  I am, dear sir, very sincerely and affectionately, yours.  William Tilghman.
To Benjamin Chew, Jun., Esq.

July 10, 1816.—The above proposals are perfectly agreeable to me, and I engage to do any thing necessary on my part for carrying them into effect.  B. Chew, Jun.
William Tilghman, Esq.

(Indorsed) 10 July, 1816.—W. Tilghman's proposals respecting his daughter's property to B. Chew, Jun., and Mr. Chew's assent as to the same.

Mem. May 10, 1818  The settlement intended to have been made of part of my daughter's estate was prevented by her unfortunate death, soon after she came to the age of twenty-one. The land which was to have been sold with her concurrence, cannot now be sold, as the reversion, after my death, is vested in her infant son. Mr. Chew, however, will receive 10,000 dollars on my death, being the amount of a bond which I gave to my daughter, in consideration of her releasing to me her interest in certain parts of her real estate.  William Tilghman.

ther what had been concluded and articled between himself and this defendant by the contract of the 10th day of July, 1816; and although the stipulations thereof varied materially from the original intent, meaning and views of the said father of this defendant, and from what had been previously agreed upon between them, yet, moved by his affection toward his son and daughter-in-law, and disregarding the inequality of these subsequent conditions, for the first time then submitted to him, after the said marriage had taken place, but for and in consideration of the stipulations on the part of the said William Tilghman thus reduced to writing, he, the said father of this defendant, assented to the agreement made on the 10th day of July aforesaid, and undertook to add largely to the advantages he had previously agreed on for the said marriage, stipulating that in case of the defendant's death he would give to his family the same provision designed for the defendant himself in the event of his surviving his said father.  The fifth schedule, hereto annexed as part of this answer, is a copy of the memorandum made by the said William Tilghman, dated the 16th day of August, 1816, relative to this transaction, and supports the allegation of the defendant, while it exhibits the confirmation of the said testator of the contract which he had previously made.[3]

"The defendant further states, that during the summer and autumn of 1816, and in the winter and spring of 1817, the said William Tilghman paid, at various times, to this defendant, and to others for him and for his use, according to and in part performance of the said contract of the 10th day of July, 1816, the sum of 2500 dollars.  These payments are manifested by the copy of entries in the said William Tilghman's books, which form the sixth schedule hereto annexed.[4] In the autumn succeeding the marriage, the said William Tilghman requested this defendant and his wife, on their return from his

[3] August 16, 1816.  I this day showed to B. Chew, Esq., the writing signed by his son Benjamin and myself, July 10th, 1816, respecting the disposition of my daughter's fortune, and he approved of it.  I then mentioned to Mr. Chew, that my intimacy with him and confidence in his integrity, had rendered it unnecessary to enter into any thing like a contract with him concerning the estate to be given by him to his son; but that I took for granted, that in case of his son's death, leaving issue by my daughter, he would make the same provision for his son's family by his will, which he would have made for his son himself, in case he had survived his father.  Mr. Chew declared this to be his settled intention; that justice required that the issue should stand in the place of the parent, and his own father had acted on that principle in making his will, and he himself should certainly do the same.  Wm. Tilghman.

(Indorsed) 16th August, 1816.—Mem. of a conversation between W. Tilghman and B. Chew, Esquires, respecting provision for his son's family in case he should die in his father's lifetime leaving issue.

[4] This schedule is omitted as it contains only the items so noticed.

father's residence, then preparing to set up his own establishment, to reside with him temporarily, as he stated he had not then raised the money agreed on. He also stated to this defendant, that until he could raise the money he had agreed to pay him, he would pay this defendant the interest thereon. And this defendant replied, that he would not expect the said interest to be paid during the time he should reside with him, which this defendant continued to do, from the middle of the month of October, 1816, until the death of his wife (which took place on the 16th day of June, 1817), and for an inconsiderable time afterward, to wit, until the 1st day of July, 1817, or within a few days more or less.

"This defendant further states, that at the instance of the said William Tilghman, an act of assembly of the commonwealth of Pennsylvania was passed on the 11th day of April, 1792 (4 Dall. Laws, 462), whereby the said William Tilghman was empowered to sell and convey the estate and property of his said daughter, during her minority, in and adjacent to the town of Northampton (commonly called Allentown), and the land so authorized to be sold by the said William Tilghman is the same land referred to in the said paper, dated the 10th day of July, 1816. But the said William Tilghman, notwithstanding the said authority, and his said contract which he was thereby authorized and empowered to conclude and to execute, did not sell and convey the said land during the minority of his said daughter, for the purpose of executing and fulfilling his said contract; nor did he pay over to this defendant the amount or any part of it received by him from sales previously made by him of several parts or portions of the said land, unless the above mentioned 2500 dollars be considered as a part of the proceeds of such sales; nor did he in any way (except as to the said sum of 2500 dollars) pay this defendant any part of the said sum of 30,000 dollars. And although the said William Tilghman then was, and until the time of his death continued to be tenant by the curtesy and in possession of the said estate, he did not sell or convey, or attempt to sell or convey the same, or any part of it, after his daughter became of age, nor did he propose to her or to this defendant to proceed to sell the same, or any part thereof, during her life, nor to this defendant after her death, in order or with intention to execute and perform his said contract of the 10th day of July, 1816. Nor did he in any way pay to this defendant, or to any one for him, any part whatever of the interest accrued to him on the money due upon the said contract, except that in consequence of several conversations had during the summer of 1818, in which this defendant remonstrated urgently with the said William Tilghman, upon his omission to fulfil the said contract, and to pay the interest upon the sum due thereon, and showed the inconvenience this defendant was, by the omission, subjected to, as well as the reciprocal nature of the con-

tracts made at the time of the said marriage, the said William Tilghman authorized the defendant to receive as his tenant at will, under a stipulated rent, and under other conditions, the profits of a small farm, part of the land mentioned in the said contract, and part of the land which he was empowered to sell during the minority of his daughter by the said act of assembly of the 11th day of April, 1799, as this defendant conceives, which said profits did not net to the defendant 100 dollars per annum, as he verily believes. And this defendant took the said profits towards satisfaction of the interest due to him in part, as far as the said profits would go, not being able to obtain other without legal proceedings, which the nature of his connexion with his father-in-law, the said William Tilghman, would not for decency permit, and the said defendant always intended and avowed his intention to discount the amount of the net profits received by him from the said farm, from the interest due to him, whenever he should come to a full settlement and obtain payment thereof. The seventh schedule hereto annexed, is a true copy of the said authority, in the proper handwriting of the said William Tilghman.[5]

"During the minority of the said Elizabeth Margaret, and before her said marriage, the said William Tilghman sold divers estates, of which she was (solely or jointly with others) seised in fee simple of her own right, to wit: A farm in Bucks county, Pennsylvania, to John Flack, on the 13th day of February, 1804, for 1500 pounds. A lot in Chestnut street, Philadelphia, to George Fox, Esq. on the 31st day of March, 1802, for 1000

[5] Philadelphia, 22d August, 1818. My Dear Sir,—It was my wish, as I have often told you, to take upon myself the entire expense of maintaining and educating my grandson; but you are of opinion that this would be attended with inconveniences. I have, therefore, determined to give you possession of the farm in Lehigh county, now in the occupation of my tenant, Peter Walpman, together with my share of the crop this year, the best that ever was made there. You are to pay me a rent of one dollar yearly on the 1st day of January, if demanded, pay the taxes, keep the buildings and fences in good order, and suffer no waste to be committed in the woodland. You may have the farm during my life, subject to the following conditions: 1st, As every thing in this world is uncertain, it may happen that hereafter I may find it expedient to reside, at least during the summer seasons, in Lehigh county; in such case, I am to have the right of resuming the possession of any part or the whole of the farm; but if the child shall be living, and you shall still desire that he should receive his support immediately from yourself, rather than me, I will pay you, by way of equivalent, as much as in the opinion of judicious men would be a fair rent for the farm. 2d. If (which God forbid) the child shall die, I shall stand in a very delicate situation with respect to the estate in Lehigh county, and therefore must reserve the right of doing with this farm what, upon reflection, it shall appear to me that justice and prudence may require; but in all events, I shall be disposed to conduct myself towards you with kindness and liberality. I am, affectionately, yours, William Tilghman.

Benjamin Chew, Esq.

pounds. And a farm in Morris county, New Jersey, to Amos Grandine, on the 20th day of February, 1799, for 3000 dollars. Also, after the said Elizabeth Margaret attained full age, the said William Tilghman requested this respondent (then married) to execute a deed of conveyance with his wife to Margaret Tilghman Lawrence (now M'Whorter), of all the estate, right and title of himself and his wife in and to a tract of land in Middlesex county, New Jersey, called the Longbridge farm, in pursuance of an engagement made to that effect by the said William Tilghman to Colonel John Lawrence, father of the said Margaret T. Lawrence; a copy of which engagement, and of a letter from the said William Tilghman to the said Margaret T. Lawrence, in the proper handwriting of the said William Tilghman, form the eighth schedule hereto annexed.[6] The respondent accordingly proposed to his said wife to comply with the request of the said William Tilghman in this respect, and they accordingly did execute on the 14th day of May, 1817, a deed of conveyance to the said Margaret Tilghman Lawrence (now M'Whorter), for all the estate of this respondent, and of his said wife (being one equal sixth part), in the said tract of land. And the said William Tilghman also requested the respondent (after his marriage as aforesaid) to execute a release to him of his own and of his wife's claims and titles to the said estates sold by the said William Tilghman, and to their purparts or proportions thereof, for which the said William Tilghman stood engaged by certain obligations, copies whereof form the ninth schedule hereto annexed.[7]

"And the said William Tilghman declared to the respondent that he would therefor give a bond for 10,000 dollars, payable after his death, which he estimated to be an equivalent or more for the said estates and properties. And the respondent and his wife thereupon executed a deed dated the 14th day of May, 1817, a copy of which forms the tenth schedule hereto annexed.

"But the respondent doth not, and never did consider the said bond an equivalent for the property released, but it became his property at the time of the execution thereof, and was so declared to be by the said William Tilghman to the respondent. The said bond remained in the respondent's possession, from the time of its execution until the said William Tilghman's death, and until the payment thereof by an appropriation of funds belonging to the estate. The eleventh schedule, hereto annexed, contains a copy of said bond, which was executed and delivered on the same day and at the same time with the deed of release aforesaid (although it bears on its face the date of the subsequent day). The respondent expressly alleges and maintains that a debt is now due to him from the estate of the said William Tilghman, by reason of the stipulations contained in the instrument hereinbefore referred to, dated the 10th day of July, 1816, and that he never received payment of the same, except to the extent of 2500 dollars as aforesaid. And the respondent denies that the said debt has ever been satisfied, either in the lifetime of the said William Tilghman, or by bequests and devises in his will. And the respondent expressly and especially denies that he ever received the said sum of 10,000 dollars in satisfaction, partly or wholly, of any debt due to him, except the debt due upon the said bond, or that he received the legacy of 5000 dollars, mentioned in the complainants' bill, in satisfaction or discharge of any debt or engagement, contract or liability whatever, or of any part or portion thereof, or that he received the profits of the farm, above mentioned, in satisfaction of the interest on the sums due to him, except so far as the amount of the said profits would go towards the discharge of the same; but maintains that his right to recover the balance due upon the instrument of July 10th, 1816, and the interest that has accrued thereon, is unimpaired and in full force, to wit, the sum of 27,500 dollars, with interest thereon from the 1st day of August, 1817, deducting from the amount of the said

[6] Schedule eight consists of three documents, by which it appears, that Mrs. Chew's grandmother died in 1799, upon which Longbridge farm descended to her issue, and testator's daughter, in right of her deceased mother, took one-sixth. But her grandfather stating that the grandmother had always intended this farm for her daughter Margaret (Mrs. M'Whorter), testator entered into a written stipulation that his daughter, on attaining her majority, should comply with her grandmother's intentions as to this one-sixth of the farm. Accordingly when Mrs. Chew attained her majority, she and her husband, by deed of the 14th of May, 1817, united in a conveyance of her one-sixth for the consideration, therein expressed, of natural love and affection, and of one dollar, which is the conveyance referred to in this part of the answer.

[7] Ninth, tenth and eleventh schedules consist of sundry documents, by which it appears that of certain real estate sold by the testator before his daughter's marriage for 9666 dollars and 67 cents, he was tenant by the curtesy, with remainder to his daughter as heir to her mother; that testator (with the consent of his daughter's nearest collateral relatives and heirs) conveyed the same in fee simple to the purchasers, with covenants that his daughter on her majority, or the heirs of his wife, if she died in her minority, should confirm the title. Mr. and Mrs. Chew accordingly, on the 14th of May, 1817, released the same to the testator, who executed deeds of confirmation as required. The release of the 14th of May, 1817, recites the facts fully, and is expressed to be in consideration of one dollar, and of 10,000 dollars secured by the testator to be paid to his daughter or her representatives within one year from his death. The bond securing this sum is accordingly an obligation to the daughter, payable within one year after testator's death, and is the same which is mentioned in the will. The eleventh schedule is a copy of this bond and of a receipt and acknowledgment by Mr. Chew, the defendant, when he received payment of it out of the estate. The acknowledgment refers to the consideration of the bond, and declares that the money is received in full satisfaction thereof.

interest the net profits received from the said farm from the 22d day of August, 1818, to the 29th day of April, 1827, when, by the death of the said William Tilghman, he was deprived of the said profits. And the respondent further states that he did not, at any time, or in any manner, relinquish or waive his right to receive from the said William Tilghman, and from his estate, the sum stipulated in the instrument dated the 10th day of July, 1816, with interest thereon. On the contrary, he declared repeatedly to the said William Tilghman, and at sundry times, that he considered the same due to him, and the said William Tilghman liable for the same. The said William Tilghman gave no direct or sufficient answer to such remarks, but on one of the occasions referred to observed, that if he was to pay this defendant, he would have to sell the house over his head, which expression was among the most powerful reasons why this respondent deferred insisting on his legal rights during the lifetime of his said father-in-law. On two different occasions the defendant declared to the said William Tilghman as aforesaid (that he considered the said sum due, and the said William Tilghman liable for it), previously to the 10th day of May, 1818. He did not prosecute or pursue his claims except by personal remonstrances during the lifetime of the said William Tilghman, because of a sincere attachment to him, and of a decent respect for his ease and comfort, and because of the respondent's firm conviction that his lawful rights, acquired and purchased by an ample, valuable consideration furnished by his father, as well as by the good consideration of his marriage, would be in no manner impaired by his postponing to take legal measures for their recovery. The respondent states that at the foot of the instrument dated the 10th day of July, 1816, there appears a memorandum, dated the 10th day of May, 1818, a copy of which is part (numbered B) of the fourth schedule hereunto annexed. The respondent explicitly denies that he, at any time, directly or indirectly assented to the same memorandum, or to the principles therein expressed. He positively asserts that he had no knowledge whatever thereof, or of any intention of the said William Tilghman to make such a memorandum, until long after it was made; and he distinctly and positively alleges and asserts, upon his oath, that it is in spirit and in letter, in form and in matter, wholly and directly contradictory and at variance with his views, expectation, belief and conviction, and with his unvaried, avowed, well known and positive declarations and determination. The said instrument, dated the 10th day of July, 1816, having been prepared by the said William Tilghman, and presented by him to this defendant for assent, and having the signature of this respondent to it, and it being a matter of indifference in the hands of which of the two parties it should remain, when they had such faith in one another as to make and sign but one copy of an obligation, without witnesses, whereby they were bound to each other in the amount of so many thousands; and this respondent having a perfect confidence in the honour and good faith of his father-in-law, which are manifested by the preservation of the instrument, it naturally remained in the said William Tilghman's possession. But the respondent always regarded it as remaining there as in a place of safe keeping merely, without any right in either party to add, alter, amend or impair its full force and effect, and without any right of either party to inscribe or to indorse thereon any thing expressing sentiments of either party derogatory to their mutual understanding at the time the contract between them was made. And the respondent expressly protests against the said memorandum, and maintains that the original instrument itself remains in full force and virtue altogether unaffected by the memorandum made by one of the parties. The respondent further states, that besides the sales of the said William Tilghman, already enumerated, he and his wife did, on the 3d day of April, 1798, convey to a certain Samuel Davis, for a nominal consideration, a tract of land being the estate of his said wife, the mother of the wife of the respondent, in the county of Northampton, containing five hundred acres adjacent to the borough of Northampton, which was reconveyed by the said Samuel Davis, on the same day, for a like nominal consideration to William Tilghman alone, who afterwards sold the same in various parcels to various persons for large sums of money, which were invested by him, as the respondent has frequently heard and does verily believe, in the purchase of the house and lot in Chestnut street, where he resided for many years, and which he afterwards sold for 42,500 dollars. And the said William Tilghman, during the minority of his said daughter, sold, under the power vested in him by the act of assembly dated the 11th day of April, 1799, sundry lots of ground belonging to his daughter, reserving a ground rent of 1 or 2 dollars on each lot sold, payable to himself for life, and after his death to his said daughter and her heirs. And he also received from the purchasers, for his own use, large sums of money or value, in addition to the said ground rents, amounting at the least to 6800 dollars. And the said William Tilghman did request and desire this respondent, after the decease of his said wife, to unite with him in a petition to the legislature of Pennsylvania for authority to sell, during the minority of the respondent's said son, lots in the borough of Northampton belonging to the said son of the respondent; the respondent did accordingly join in such petition. An act of assembly was passed on the 23d of March, 1818 (Laws of 1817–18), giving the said authority, and

sales were made in virtue thereof, by the said William Tilghman, who received the purchase money or value amounting to more than 700 dollars. The said William Tilghman thus received from the various sources aforesaid, property and estates belonging to the wife and son of this respondent, or which would otherwise have belonged to them, a sum of money exceeding 50,000 dollars, which in equity and good conscience ought to have been applied to the discharge of the marriage contract aforesaid. The respondent, therefore, denying any injury or wrong to the complainants, denies also that there is any hardship to them in his taking and appropriating from the estate of the said William Tilghman the money which is due to him upon the said marriage contract and the interest thereon accrued, inasmuch as the said William Tilghman added to his own estate a sum much larger than is sufficient to pay the amount stipulated for by the said contract, together with the interest thereon, by means which were derived from the estates which would otherwise have come into the possession of the wife and son of this respondent and of himself." The conclusion of the answer is in the usual form.

The following paper was read in evidence at the hearing, together with the indorsement thereon, which was in the handwriting of the testator.

"The disposition which I wished to make of the estate of Elizabeth M. Tilghman, as it shall become subject to my disposal, is as follows: The law shall take its course with all land which may belong to her, except in case of no issue surviving her, when I renounce the tenancy by the curtesy. If I should survive her, I renounce my legal right to her personal property, except issue shall survive her also. All property will be included in the above two sections, which is considered as capital belonging to her estate. These two provisions to take effect in case of the subsequent death of issue, which may have survived her. To give full power of making a writing testamentary, which may dispose of every part of her estate, except issue survive her, when the disposition shall not be to their disadvantage. It being always understood, that during the coverture my control over all the estate is to be bounded by the law only, and that this arrangement is not to be considered as extant until the moment when its provisions are to take effect, and then my own estate shall be answerable to them. The law provides for the distribution of my estate, at the least the advantages it gives her shall be fully preserved to her. Finally, no debt of mine shall affect her estate, which shall have priority to all other claims upon my property. B. Chew, Jun.

"Done 10th July, 1816, at Philadelphia."

Indorsed—"July 10, 1816. B. Chew, Jun.'s proposals to W. Tilghman, respecting his daughter's property.

"Mem.—Instead of these proposals, W. T. drew others more favourable to Mr. Chew, which were assented to by Mr. Chew. These writings are dated July 10, 1816."

Mr. Rawle, Jun., for complainants.

The conversation between Mr. Tilghman and Mr. Chew, Senior, as detailed in his deposition, was not a contract for a marriage settlement, but was merely preliminary to the one made on the 10th July following; which having been assented to by all parties, was a substitute for what had been before in contemplation, merging any agreement which could be inferred from it. Taking the agreement as now set up, it has no mutuality. Mr. Chew claims the 30,000 dollars as payable to himself for his own use, while he would hold the Jersey farm in fee, and receive the interest of the 25,000 dollars without any obligation by him or his father to provide for the widow or the issue of the marriage, in case they survived him, thus leaving both sums at his disposition. The subsequent agreement of Mr. Chew, Sen., that in case of his son's death he would continue the same provision for the issue as he had made for his son, still left Mrs. Chew wholly unprovided for; it never could have been intended by Mr. Tilghman to give 30,000 dollars for a consideration so precarious and unequal. He was at liberty to raise that sum as he pleased, to settle it as he might think proper, with a reversion to his own family, as was the case with the portion to be given by Mr. Chew, if his son died without issue of the marriage. The letter of 10th July shows that the fund was to be raised out of the daughter's property; that letter does not bind Mr. Tilghman to pay any thing of his own; it was the only contract between the parties, the completion of which was prevented by Mrs. Chew's death without any act or default of Mr. Tilghman. It could not be done before she was twenty-one, and as her estate was to create the fund, it required hers and Mr. Chew's deed to do it. Mr. Tilghman was not answerable when this became impossible by her death (1 Bac. Abr. 139; Fonbl. Eq. c. 6, § 2; 2 Pow. Cont. 19, 20; 2 Freem. 35; Finch, 445; Skin. 287) or bound to do any act towards performance till requested by Mr. Chew. Mr. Chew had not performed his part of the contract, and cannot claim a specific execution by Mr. Tilghman, nor can he connect his claim under the agreement, with the sales made by Mr. Tilghman, under the act of assembly; as the real estate, if unsold, would go to Mrs. Chew's heirs in case of her death, and if sold, the proceeds were directed by the law to be paid to such persons as would have been entitled to the estate, if it had remained unsold (4 Dall. Laws, p. 463, § 4), or if sold subject to a ground rent, the reversion was to her heirs (Id. p. 464, § 5).

Mr. Chew cannot claim under the verbal agreement and the letter of the 10th of July,

but must make his election, as they are widely different. He cannot take the legacy under the will, without abandoning the present claim, as it will absorb the whole residuary fund and defeat the intentions and express dispositions of the testator; a man cannot take a benefit under a will, and defeat one of its devises. 2 Rop. Leg. 378, 383; 15 Ves. 391, note. Mr. Chew must fulfil the directions of the will, or refund what he has received under it (2 Brown. Ch. 600), and having undertaken the execution of the will, he must perform all the trusts thereof. His claim is barred by the lapse of time. Mr. Tilghman denied the claim in 1818, which was not repeated by Mr. Chew during the lifetime of the former, nor was any notice given to him that it would be asserted; the declarations of Mr. Chew to third persons, that he intended to claim the debt, can have no effect on the case. Besides, he has bound himself by signing the petition to the legislature in March, 1818, for a sale of the lands out of which the fund was to be raised, in pursuance of which, Mr. Tilghman was authorized to make sale thereof for the benefit of his grandson, or such persons as were entitled to the reversion.

J. R. Ingersoll, for Mr. Chew.

Mr. Tilghman was bound to provide and place in the hands of Mr. Chew 30,000 dollars, the contract was confirmed by the marriage, which fixed his liability; he received an equitable equivalent in actual pecuniary advantage, the claim has neither been discharged nor waived, it was valid against him during his life and is a charge on his estate, which equity will not take out of the hands of Mr. Chew till it is paid. There are besides equitable grounds for enforcing this claim independent of the marriage contract, arising out of sales made of Mrs. Chew's real estate, from which Mr. Tilghman received, beyond the amount of the post obiit bond, about the amount of the promised portion. Equity, looking to substance, not form, will inquire whether the whole case makes out a contract which is binding in conscience and good faith (1 Pow. Cont. 189), and supply all defects in form (Fonbl. Eq. bk. 1, c. 1, § 7), or mistakes in drawing the paper (2 Vern. 480); it will take both the verbal and written agreement into view, and make one contract, if either or both import one. The verbal contract was full and complete as the basis of the proposals of Mr. Chew, Jun. to settle the 30,000 dollars on his wife and children, which brought out the substitute of 10th July, but for which, Mr. Tilghman would have remained liable under the verbal contract. He considered this substitute as better for Mr. Chew than his own proposals, as appears by his indorsement, and they must be so construed in equity. The paper of July refers to the previous conversations admitting an obligation to provide the sum first stipulated; it proposes to do it out of the daughter's estate, but it is an undertaking by Mr. Tilghman to raise the 30,000 dollars, without any act to be done by Mr. Chew or his wife. It was a boon asked by Mr. Tilghman, to release himself and estate from the obligation of the contract, by raising her portion out of her property, not by an immediate sale, but after she was twenty-one; the letter of 10th July is a guarantee that she should then confirm the contract; if she refused or neglected, Mr. Tilghman remained liable on his original undertaking. In agreeing to this proposal, Mr. Chew stipulated only for his own performance, not hers, though his joining might be necessary, yet as he did not promise for her, the risk was Mr. Tilghman's, not Mr. Chew's. Mr. Chew had then no interest in the property, as Mr. Tilghman was tenant by the curtesy, so that his deed could give no effect. Before he could have any interest, his wife must be seised in deed (Co. Litt. 29a), if of a reversion, the particular estate must determine during coverture, his seisin must be of an immediate freehold or the inheritance to give him any interest. Her deed, therefore, would have availed on the same rule that a fine levied by a feme covert is good to estop her, though not her husband (Hob. 225); but as he was estopped by his assent, her deed would have made the title good. A feme covert may release dower without her husband joining, and may do by deed here whatever she may do by fine in England; the only difference is, that here the separate acknowledgment must be set out. Had Mrs. Chew died before coming of age, the performance of the agreement of July would have been impossible by the act of God, but as she arrived at twenty-one, when the condition could have been performed, the contract became single, as there was no default in Mr. Chew. 2 H. Bl. 178. The default was in Mr. Tilghman, for he took a deed of confirmation of sale made by him, from Mrs. Chew in May, 1817, after she became of age, and no reason has been shown why he did not also procure her deed confirming this agreement. In this agreement the promises of Mr. Tilghman and Mr. Chew, Sen. were the consideration, not the performance on either side; it is not the case of precedent or concurrent conditions, on the performance of which by one party the obligation of the other depends, but a marriage contract in which the issue of the marriage being interested, the default of one party will not exonerate the other. 1 Pow. Cont. 261; 2 Pow. Cont. 18, 19; 1 Ves. Sr. 377, 378. Here it was in the power of Mr. Tilghman to have had the agreement perfected, he is consequently entitled to no relief against his own default. 1 Fonbl. Eq. 391; 2 Freem. 35.

The agreement of July was only a modification of the verbal contract, as to the mode of settlement, the nature of the estate of Mr. Chew, and the substitution of the daughter's for the father's property to raise the fund,

which were the attributes or incidents, the mode of carrying the contract into effect, not the contract itself. That was neither extinguished or superseded, it bound Mr. Tilghman to make the provision out of his own estate, if it was not done from the daughter's; Mr. Chew has a right to rely on both agreements as evidence of the one contract, he cannot give any evidence to contradict his answer, or claim any relief not asked for; but as he is a defendant asking only to be dismissed, the same strictness as to averments is not required, as if he was a plaintiff. 2 Anstr. 397, 491. It is enough that the answer discloses the whole case, relying on a debt or duty existing before the 10th July, which must be discharged in some way, several deeds made at the same time, on the same subject, are but one. 1 Fonbl. Eq. 436; 1 Brown, Parl. Cas. 14; 17 Serg. & R. 110. The answer is explicit in relying on a contract, an agreement in consideration of marriage, it is fully proved, whether completely made at one, or different times is not material, it was in part performed on the part of Mr. Chew, Sen. who might take a year to complete it, as no time of performance was fixed. It was not material whether it was completed before or after the marriage, as was decided in Magniac v. Thomson [Case No. 8,-956], or whether the fund was to be raised from the father's or daughter's estate, as she was his only heir, unless he survived her, in which case his estate must do it. The post obiit bond had no connection with this contract, as it was for money then due by Mr. Tilghman, for the lands sold.

Proposals in writing by the friend of a suitor to the friends of the woman, though no answer is returned, if a marriage ensues, are an agreement executed, binding on all sides (15 Vin Abr. 282, W, pl. 1; Finch, 146); so when it was done by a letter, and the offer in part performed or the marriage assented to, or no dissent expressed (2 Vin. Abr. 322, 373), the party is not deprived of the benefit of the contract, though he receives a legacy left him by the will of the party bound, it will be presumed to be given from affection, and not in satisfaction (15 Vin. Abr. 282).

Mr. Tilghman could not revoke this contract by his memorandum of May, 1818, the consideration was a continuing one, and good to support any promise after marriage (2 Salk. 96), the advance of money to buy furniture shows Mr. Tilghman's understanding that he was personally bound by the contract, of which it was a confirmation, as was the giving possession of the Northampton farm after August, 1818, and the giving and accepting the deed of the Longbridge farm in May, 1817.

As marriage was the consideration of the contract, it was complete on that event, so as to be in no wise affected by the death of Mrs. Chew, which was provided for in the agreement of the 10th July, a right to the promised provision accrued on the marriage, it was a debt due to Mr. Chew continuing till satisfied, he became a creditor to the estate of Mr. Tilghman, entitled to his debt as well as any legacy left him by the will. In 3 Ves. 466, the supposed rule that a legacy extinguishes a debt, is called an absurd one; here the will directs debts and legacies to be paid, in such cases both must be paid (1 P. Wms. 408); so in any case where the legacy is less than the debt (2 Madd. 36; 2 Vern. 498; 2 P. Wms. 553; 11 Ves. 544). It is a rule that a party cannot claim in repugnant rights under and against a will, if he claims under it, he must claim under the whole taken together (1 Thomas' Coke, 454, 525; 1 Brown, Parl. Cas. 492; 2 Ves. Jr. 500, 693, 696); as when a testator devises property which is not his own, and gives an equivalent to the owner, he shall be put to his election, if he accepts the equivalent he must relinquish what has been devised to another (Atk. 182; 2 Ves. Jr. 696; 4 Ves. 531; 9 Ves. 533; 13 Ves. 220). Here, however, there is no repugnancy; the will charges the whole estate with both debts and legacies, without any direction that the legacy shall discharge the demand, in such cases a party is not put to his election (1 Atk. 509; 2 P. Wms. 553); nor unless there is a plain intent, or necessary implication in the will that the legacy shall be a satisfaction (1 Ves. Jr. 523; Id. 265); the presumption is against the extinguishment of a debt (3 Atk. 67); the legacy must be given for such purpose or the debt remains (2 Ves. Sr. 636); and unless the will directs it, a creditor cannot be put to his election (2 Madd. 42; 12 Ves. 154).

The receipt of the legacy being no bar to the debt, its obligation on Mr. Tilghman is not impaired by his omission to provide the fund when it was in his power; it is in clear proof by Mr. Chew's declarations, that he never abandoned the claim, in his answer he states that Mr. Tilghman promised to pay interest on what was due. This averment is not contradicted, and is evidence, though not directly responsive to the bill; for the bill referred to the whole subject matter of the claim of Mr. Chew, as to which he was called on to answer particularly. As it cannot be pretended that it was the intention of the parties, that Mr. Chew should be unprovided for, by the failure to make the contemplated settlement in Mrs. Chew's lifetime, equity will decree an equivalent (Fonbl. Eq. bk. 1, c. 6, § 9), so that the intended object shall be effected. In addition to this consideration, there are two contracts, which must be executed unless they have been dissolved by the parties who made them; the agreement of the 10th July did not merge the previous one unless it was consummated, its failure left the former in full force, Mr. Chew's assent to it as a substitute, was to it when executed, not to take the promise as actual performance.

The lapse of time as an equitable bar, is fully accounted for by the situation of the parties towards each other, the events follow-

ing the marriage and the declaration of Mr. Tilghman of his inability to pay the amount without selling his house over his head, stated by Mr. Chew in his answer responsive to the bill. The time for performance was indefinite, after Mrs. Chew became twenty-one; time is therefore no statutory limitation; it does not run against an executor nor is he bound to plead it. 1 Atk. 524; 15 Ves. 498. A party who wishes to avail himself of time as a bar, must plead it, insist on it in his answer, or by a special replication. 1 Atk. 493; 2 Madd. 244.

Equity considers that as done which ought to be done. The marriage fund was in the hands of Mr. Tilghman in his lifetime. Mr. Chew now holds it. Equity will decree his retention of it according to the original intention of the parties. 2 Comyn, Cont. 406. Mr. Chew is a creditor whose debt is not extinguished by being an executor. Retaining for his own debt is consistent with a due course of administration. The complainants are volunteers, conditional legatees. The claims of justice and cravings of bounty can both be satisfied out of the estate, by decreeing to Mr. Chew the use of the fund for life, on giving security for its payment after his death, when the complainants will be entitled to its ultimate enjoyment.

Mr. Binney, for complainants.

The plaintiffs claim legacies left them by the will of Mr. Tilghman and offer refunding bonds, payment is resisted by one executor on account of a debt due to himself; the case comes before the court as on a declaration and plea in bar, presenting a definite issue, on the decision of which the allegations of the answer are not evidence, because not responsive to the bill. The bill suggests the claim of Mr. Chew as the plaintiffs understood it, the answer sets it up under the agreement of July 10th, 1816, and no other, and it is set out specially; the part performance relied on, the breach, the stipulation creating the alleged debt, are all referred exclusively to this agreement, with a denial that it was relinquished, or that the defendant ever agreed to the memorandum made by Mr. Tilghman in May, 1818. The answer alleges also, that the agreement of July was left in the hands of Mr. Tilghman, as the contract between them, and that Mr. Tilghman received more money from the estate of Mrs. Chew than was required to make up the sum agreed to be settled. This is the case to which the defendant has sworn, the court can decide on no other (Linker v. Smith [Case No. 8,373]; 6 Johns. 543); for if after failing to establish what is sworn to, a defendant can rely on other matters, his conscience is not in his answer; the decree must be on the matter sworn to in the answer, which is denied by the general replication. The claim is made by Mr. Chew in his own right, not in right of representing his wife. He can make no claim under the act of 1818, as Mr. Tilghman was accountable to the own-

ers of the reversion after his death, nor under the act of 1799, as his heirs were bound to pay Mrs. Chew, if she arrived to twenty-one, or to the heirs of Mrs. Tilghman in case of Mrs. Chew's death without issue.

The claim is a stale one, and the less to be favoured by concealing it from Mr. Tilghman, while a declaration was made to others that it was intended to be made, as he was not put on his guard, so as to meet it by evidence, or to deny it by his answer. The purchase of furniture was no part performance of the contract of July, for it contained no reference to furniture, the possession of the farm was gratuitously given on account of the child, as appears by the letter of Mr. Tilghman in August, 1818. The averments in the answer that it was on account of interest are not proved, and so not evidence; we may use the answer to show the admissions of Mr. Chew, but are not bound by its assertion of any thing against us, because they contain affirmative matter, not as a defence to the bill but in support of a claim in bar.

The defendant must prove the contract he sets up in his answer, proof of a different one is not admissible, or if received, the decree is erroneous. 5 Johns. 543; Thompson v. Tod [Case No. 13,978]; [Simms v. Guthrie] 9 Cranch [13 U. S.] 19; [Carneal v. Banks] 10 Wheat. [23 U. S.] 181. We come prepared to meet the alleged agreement of the 10th of July, and not the verbal one which was in conflict with it, if there was a modified agreement compounded from the two, it is neither proved nor set up in the answer, so as to admit evidence touching it, and the answer avers it to be different from the one made in July and ratified by all parties in August. This was the only modified agreement, on the defendants showing, on which there is any pretence for a claim. The verbal contract, taken as proved by Mr. Chew, Sen., is too vague for any decree to be made upon it, the promises were by Mr. Tilghman to make up 30,000 dollars for his daughter, and by Mr. Chew to make up the same sum for his son. Neither was to provide for the child of the other, a settlement on the daughter out of her own estate would have been a compliance with the promise. The paper of July contains no promise, but merely a declaration of the mode of raising an income, on which no debt can arise or a claim for damages be founded, the answer states no facts from which a duty can be inferred, it does not aver the daughter's consent, any offer or demand of performance by Mr. Chew, or any refusal or default in Mr. Tilghman, no covenant, guarantee or engagement that the daughter shall execute the necessary deeds, nor any personal liability assumed by him on her default. It was necessary for Mr. Chew to join, for the remainder in fee being in her, her deed alone was void. 2 Rop. Prop. 97; Ath. Mar. Sett. c. 2. No purchaser would have taken hers and Mr. Tilghman's deed, and as Mr. Chew had not offered to join, he has no claim; the acts required to

perfect the agreement were concurrent in both parties, and neither can recover for a breach without averring and proving performance or offer to perform, though it is otherwise as to independent covenants. 2 Saund. 352a, note 3; Doug. 691. Both parties took the risk of Mrs. Chew's death, the party desirous of performance was bound to hasten the other by a request, if either is in default in law, he can have no claim in equity; here the defendant is in the position of a plaintiff, bound to make out a clear case of a debt due, or a duty assumed by Mr. Tilghman, binding on him and his estate. The agreement of July is an informal one, which equity will mould by the exercise of its largest powers, in order to effectuate the intention of the parties by making a limitation in strict settlement, or in providing for the issue, contrary to the words of the agreement, if such appears to have been the object of the agreement. Here it was only a provision for the marriage, not looking to the issue or the death of either Mr. Chew or his wife, no estate in trust was created, the fund was to be raised by a sale, it was for the use of the wife, and chancery would make such a decree as would secure it to her and the issue of the marriage. The only act required from Mr. Tilghman was a deed conveying his estate by the curtesy, Mr. Chew and wife owning the estate in fee could complete the settlement, it has failed by the common default of all parties would any demand of performance by either, of course, without liability for the consequences.

Before BALDWIN, Circuit Justice, and HOPKINSON, District Judge.

BALDWIN, Circuit Justice. The alleged contract between Mr. Tilghman, and Mr. Chew the defendant, consists of two parts: 1. The conversation between Mr. Tilghman and Mr. Chew, Sen., communicated to Mr. Chew, Jun.; 2. The letter of Mr. Tilghman of the 10th of July, 1816, assented to by both the Messrs. Chew. Taking the conversation as a verbal agreement, it was a mutual promise that each should provide for his own child a portion of 30,000 dollars; no fund was designated out of which the portions were to be raised on either side, except as to 5000 dollars by Mr. Chew, by conveying a farm in Jersey to his son; neither party assumed any obligation to provide for the child of the other, referred to any provision for the issue of the marriage, or any limitation or mode of settlement of the respective portions. The object seems to have been a personal provision for the parties to the marriage, to be made separately by their parents, each taking on himself the raising their portions for their own use, neither promised that the child of the other should have any interest in his own child's portion during the marriage, or after the death of either. The promise of Mr. Chew, Sen. to make the same provision for the issue after his son's death, as he was to make for his son in his lifetime, formed no part of the conversation before the marriage, but is admitted to have been made afterwards; that promise however did not extend to Mrs. Chew if she survived her husband, and as the Jersey farm was to be conveyed to Mr. Chew, Jun. in fee, she could have only her dower out of it. The declaration by Mr. Chew, Sen. of his intention to make the same provision for his son's family by his will, as he would have made for his son if living, was also after the marriage, and in consideration of the agreement of the 10th of July; so that previous to that day, there is no evidence that Mr. Tilghman had made any promise or agreement to give the defendant any interest in his wife's portion, or to so settle it on her as to give him any control over it. The extent of any obligation assumed, was to give or make up to his daughter the stipulated portion; in law the defendant was no party to this promise so as to sustain an action for it, but even if he had any legal right to it, a court of law must award it to him absolutely, having no power to compel him to settle it on his wife or children. This promise therefore could create no legal debt due to defendant or give him any claim to damages for its breach at law, it must be treated as other contracts for the payment of money or the performance of collateral acts. A plaintiff must show his interest in the act to be done, its extent, the breach of the contract, with the amount of damages he has sustained thereby; these would be insuperable obstacles in the present case (conceding the verbal agreement to be fully proved and clearly broken) to a recovery at law. It is only in a court of equity that all parties in interest could apply for the apportionment of a fund, to which no party had an exclusive right, but even there it would be difficult if not impracticable to give the present defendant any relief. The contract is so vague and indefinite in most of its important parts, that if the decision in this case turned upon it, "this defect in the proof would be fatal to the claim of the defendant." The contract sought to be enforced ought to be clearly proved, its terms to be precise, so that neither party could reasonably misunderstand them, if it is vague, uncertain, or the evidence insufficient, a court of equity will leave the party to his remedy at law. Colson v. Thompson, 2 Wheat. [15 U. S.] 341.

Contracts in consideration and contemplation of marriage are binding in law and equity, yet they must have those attributes which will alone induce courts of equity to decree a performance variant from its terms. In this case the promise of Mr. Tilghman was not made to meet any stipulation made by Mr. Chew in favour of the intended wife, each parent was free to have made a settlement on his own child of their respective

portions with a reversion to themselves and their own right heirs, which equity would not disturb in the absence of any agreement to the contrary. Marriage agreements are construed in equity most liberally in favour of the issue of the marriage, who are considered as purchasers incapable of taking care of themselves. Equity will protect them under marriage articles limiting an estate tail to the parties to the marriage, by decreeing to them an estate for life only, with a remainder to the issue in strict settlement. 2 Vern. 658; 1 Ves. Sr. 239; 2 Atk 40; 2 Johns. Cas. 222; 1 Desaus, 443. But this rule does not apply to the parties, unless by the terms or manifest intention of the agreement they appear to have an interest in the fund to be provided. In this case there seems to me to be no such agreement or intention, but if Mr. Chew, Sen. had promised to give to his intended daughter-in-law a life estate in his son's portion if she survived him, there would have been powerful reasons for holding Mr. Tilghman bound to make an equivalent provision for his intended son-in-law. This would make the promise mutual, whereas all mutuality would be wanting by holding him so bound by the contract as stated and proved. It is not in equity a necessary incident to a marriage contract that the husband should have any interest in the wife's portion, when she has none in his, or that the survivor should have a life estate in the other's portion; this will not be decreed unless agreed upon, or necessary to carry the contract into effect on principles of justice and equity. In my opinion this contract created no debt or duty on the part of Mr. Tilghman which can be enforced in equity, for the want of precision in its terms, and the want of a promise by Mr. Tilghman to make a personal provision for the defendant, in both which respects the contract is defective.

The next inquiry is, whether the verbal contract formed a part of the written one of 10th July, or whether the latter is to be taken as the final agreement of the parties, complete in all its stipulations according to their intention therein expressed, and a substitute for the verbal one as contended by complainants, releasing Mr. Tilghman from all personal liability. On the other hand, the defendant contends, that there was an existing liability in Mr. Tilghman, continuing after the 10th of July, until that agreement was performed, the risk of which was assumed by him, who remained liable under the first contract, when the second failed by his daughter's death.

It is difficult to account for the written proposition of the defendant which led to the contract of July, if there had been a subsisting contract made, definite and precise in its terms; the subject matter was not a provision to be made by Mr. Tilghman for his daughter or her intended husband, or a conveyance of his property for the purpose, but her real estate which was to provide the marriage portion. On this subject the verbal contract was silent, as well as on the nature of the limitations. Had the defendant's proposition been accepted, he would have been without any interest in his wife's portion, in the event which has happened, which is inconsistent with an existing obligation in Mr. Tilghman to give it to him absolutely or for life, or the existence of a contract so definite as to be visible or tangible in a court of equity, as to give him any right. It remained then for the parties to make a contract specifying the fund for raising the portion, with such a limitation as would give the defendant an interest in it; this was intended to be done by the agreement of July, which is full and complete in all its parts; referring to no previous contract to be modified, it fully expresses the intention of the parties. So far as it accords with the previous inchoate contract, it reduces it to writing, which, in the absence of fraud, mistake, ignorance or latent ambiguity, cannot be varied, impaired or explained by parol evidence (2 Call, 12; 4 Desaus. 211; 3 Hen. & M. 416, 417), or stating circumstances previously to the writing ([Hunt v. Rousmanier] 8 Wheat. [21 U. S.] 208, 211). If it differs from the terms of the conversation, the writing is a declaration of a change of the original intentions and an agreement to alter and rescind them. 1 Fonbl. Eq. 173, 174; Talb. 20; Amb. 317.

This conversation between Mr. Tilghman and Mr. Chew, Sen. can be viewed only as leading to or forming the basis of the writing, or as a distinct substantive contract between the parties, put into writing as marriage articles; in either case a decree must be made conformably to the construction of the written agreement, or it must be reformed according to the rules of equity, by something which more correctly indicates the intention of the parties than the agreement itself. Otherwise it must be taken to be the only and very contract subsisting between them. Any contract, however solemn, may be reformed by matter of higher consideration than the contract, but this power of reformation is limited; there must be something definite by which to reform a contract, it must refer to or recite some other agreement on which it is predicated, which it was intended to carry into effect, to which it must conform, and by which it must be controlled, construed or regulated.

Articles in consideration of and previous to marriage, are considered in equity as the heads of an agreement for a valuable consideration (2 Atk. 40; 3 Hen. & M. 406); they will be so construed as to carry into effect the intention of the parties for the benefit of the issue for whom they are purchasers (11 Ves. 228; 2 Desaus. 126; 1 Desaus. 443; 3 Ves. 245; 18 Ves. 54); any mistakes will be corrected by reforming the article

or settlement. A settlement after marriage, reciting articles before marriage, may be reformed by them; so if it was intended to be pursuant to the articles, any variance between them being presumed to be by accident. Talb. 20, 181; 1 Ves. Sr. 239; 2 P. Wms. 349, 356; 3 Brown, Parl. Cas. 333, 334; 1 P. Wms. 123; Comyn, 417; Amb. 317; 2 Vern. 658; 3 Hen. & M. 408. But the evidence of intention by which to make the reformation must be by a recital, a letter of instructions or declaration of intention, not by conjecture, but in words showing it (1 Ves. Jr. 59, 151; 5 Ves. 597, note, 600; 3 Brown, Ch. 27), otherwise the variance is presumed to be by a new agreement (1 Fonbl. Eq. 173, 174; Talb. 20). The great object of marriage settlements, is to restrain the parties from disposing of the fund to the prejudice of the wife and issue, and it is in their favour and necessarily against the husband, that equity reforms and construes them liberally to embrace the object intended; this will be done in favour of the husband or wife, where they claim in consideration of a settlement made, or to be made by them or their friends, so as to make the contract operate beneficially for the party intended to be benefited by it. ·1 Munf. 98, 112, 390. But if the plaintiff in equity has not completed his promised provision for his wife and issue, or if by her death without issue he has suffered no prejudice by what he has done towards its completion, or if by the agreement the portions were to be equal, and the husband has not made up his, equity will leave him to his legal remedy. 2 Freem. 35, 36; 3 Ves. 246.

If an instrument professing or intended to carry an agreement into effect, is so drawn by mistake as not to effect the object, it will be reformed in conformity therewith; the instrument being insufficient for the purpose intended, the agreement is considered unexecuted, and the delinquent party will be held to its performance. If however the parties have deliberately agreed on an instrument to effect their intention, which meets the views of both, it becomes incorporated into their agreement, and if not founded in mistake in fact, and is executed in strict conformity with itself, equity will not decree another security, or act as if it had been agreed on or executed. It will compel the execution of agreements fairly made, but will not make them for parties, or decree the execution of any other instrument than the one agreed on. The death of the party who was to execute the instrument which was to give efficacy to the agreement, though it frustrates the intention of the parties by an event not provided for, does not alter the case. Where the parties have on deliberate advice rejected one instrument and adopted another, equity will not decree a different one to be executed, or that to be done which the parties supposed would be effected by the instrument finally agreed upon. Hunt v. Rousmanier, 1 Pet. [26 U. S.] 9, 17, 8 Wheat. [21 U. S.] 201, 210.

In the application of these principles to this case, I can perceive no just ground for reforming the agreement of the 10th of July; from its terms it appears to have been the only agreement intended to be carried into effect, so it appears to have been considered by all parties by their subsequent conduct, and having been deliberately made, must be considered as the only foundation of defendant's claim. It is so set up in his answer and expressly stated, that though it varied essentially from the verbal contract, it was assented to by all parties, and left with Mr. Tilghman for safe keeping as the contract agreed upon; such is the case presented by the answer, on which the issue is depending on the general replication. This issue is on the facts and case stated in the answer, not on any other matter which may be offered or given in evidence at the hearing. 4 Madd. 21, 29; [Lenox v. Prout] 3 Wheat. [16 U. S.] 527; [Hughes v. Blake] 6 Wheat. [19 U. S.] 468. The opposite party must have notice by the answer of the matters relied on, so as to shape his replication accordingly, and offer countervailing evidence; he is not to be taken by surprise, or lose the opportunity of asking leave to file a special replication, which cannot be done without leave. [Leeds v. Marine Ins. Co. of Alexandria] 2 Wheat. [15 U. S.] 380; Peirce v. West [Case No. 10,909]. The same rule applies to a bill so as to enable a defendant to demur, plead or answer, according to the case stated. 1 Munf. 395; 7 Ves. 457; 12 Ves. 79; [Simms v. Guthrie] 9 Cranch [13 U. S.] 25; [Carneal v. Banks] 10 Wheat. [23 U. S.] 188; 6 Johns. Cas. 349. A party who sets up a right against another, must be confined to the allegation of his bill or answer, the court will permit no evidence of any other matter than such as tends to prove those allegations, or decree on any thing not put in issue or admitted by the pleadings. [Fullerton v. Bank of U. S.] 1 Pet. [26 U. S.] 612; Thompson v. Tod [Case No. 13,978]; [Harding v. Handy], 11 Wheat. [24 U. S.] 103; 6 Johns. 559, 563. The defendant's counsel contend for a broader rule in case of an answer than a bill, where the answer is merely a defence against a right asserted by the plaintiff, as in a tithe cause, where it was held sufficient to set up a composition or commutation generally as a defence. Anstr. 404, 491. Cases of this description are exceptions to the general rule, on account of the difficulty of definite proof, but where a defendant in his answer, goes beyond mere matter of defence, and sets up an affirmative claim, he becomes a plaintiff and must make out his case by proper allegations and corresponding proofs. Such is the present case, both parties are claimants of the same fund. one to recover, the other to retain; the only ground of denial of the plaintiff's claim, is an assertion of an affirma-

tive claim by defendant in virtue of a contract set out in the answer, both parties being actors in their own adverse right, we must decide as if the defendant's case was in a bill filed by himself.

Taking then the agreement of the 10th of July as the contract relied on for the foundation of the defendant's claim, it will be considered according to the intention of the parties, without regard to form or manner of expressing it, as a contract or articles of marriage formally executed, as a valid binding agreement or covenant to be executed according to the principles of equity, regarding only its substance. The marriage having been solemnized, is a consideration which entitles the defendant to the performance of the contract in good faith, for which the estate of Mr. Tilghman is answerable, if its breach has been by his default, or its non performance has been owing to the occurrence of any event, against which a court of equity can properly consider him as having undertaken to provide.

It was stipulated that so much of the daughter's estate be sold, after she would arrive at twenty-one, as would raise 30,000 dollars, which would be in nine months after the date of the agreement; no time was limited in which it was to be done after she arrived at twenty-one, the sale could not be before, for although Mr. Tilghman by the act of 1799 could sell, he was bound to appropriate the proceeds in the manner pointed out by that law. The postponement of the sale was from necessity, not for the convenience of Mr. Tilghman, the annual value of the estate was trifling, neither party by the terms of the agreement assumed the risk of the settlement being defeated by the death of the daughter, nor is there any principle of equity which would make Mr. Tilghman personally answerable for the consequences. That does not seem to have been contemplated at the time, it was a proper subject for a provision, had any been intended, the object was a provision for the marriage, this agreement was agreed on for security of its performance, deliberately made and accepted as satisfactory. Had it been intended to substitute the estate of Mr. Tilghman as the fund in place of the daughter's estate in the event which has happened, it would have been so stipulated, or such intention have been manifested; had it been intended to bind the estate of the wife, she would have been a party. The defendant's proposals immediately preceding the contract were, that if no issue survived her, he would renounce the tenancy by the curtesy, and all legal right to his wife's personal estate, the same provision was to take effect on the subsequent death of the issue who should survive her. This proposal met the very case which has occurred, and negatives the belief, that in the same event, Mr. Tilghman was personally to be bound, or that a stipulation to that effect was left out of the agreement by accident or mistake; it must therefore be taken as the only security required, the insufficiency of which by the death of Mrs. Chew affords no ground for our interference. Hunt v. Rousmanier [supra], is authoritative on this point.

As the agreement could not be performed before the arrival of Mrs. Chew to twenty-one, no cause of action could accrue till that event, it happened on the 19th of April, 1817, she survived it two months, so that there was time to have completed the settlement, yet though arrangements were made as to sales of her property by Mr. Tilghman, nothing was done in relation to the settlement, or any offer or demand made to execute it. Its completion required the concurrent act of all parties, of Mr. Tilghman to release his estate by the curtesy, of Mr. Chew and wife to convey the reversion; the acts must be simultaneous, or the conveyance of the fee must precede the release of the life estate, and the latter, if made to take effect immediately by a separate deed, would have left Mr. Chew and wife the sole power of disposing the whole estate, with no other control than by a court of equity in virtue of the marriage articles. Mrs. Chew was then under the legal control of her husband, her deed was indispensable, it must be her voluntary act, Mr. Tilghman could exercise no control over her, nor could he by his own act complete the settlement. The important question then arises, on whom does the law throw the duty of doing, or offering to do the acts necessary to performance, and what is such default in either party, as subjects him to a debt or damages by non performance, without request by the other, when the contract fixes no time for performance?

An obligation to pay money without naming the time of payment, creates a debt due presently on demand; if for the performance of a transitory act, it must be done in a convenient time without request, when the concurrence of the obligee is not necessary; if it is necessary, the obligee must hasten the performance by a request, or the obligor may take his lifetime. He shall also have a reasonable time after a request, and the obligee shall name a time for performance, as the making a feoffment. If the condition be to infeoff a stranger, the obligor shall require him to name the time and place, and do it in convenient time, unless the act requires the concurrence of the obligee, or of the obligee and stranger, in which case the obligor does not take on himself for the obligee who is party to the deed, as he does in the case of a stranger. 6 Coke, 31; 2 Coke, 79; Co. Litt. 208, 219; Cro. Eliz. 798; 1 Rolle. Abr. 436, pl. 1; 1 Brown, Ch. 55. In cases of forfeiture, the party is allowed his lifetime to perform the act. 1 Call, 88, 89. The party who is to have the benefit of the act may do it when he pleases. 3 Day, Com. Dig. 103, G, 3, pl. 16. Where prompt performance of the act is necessary to give the party its benefits, or its immedi-

ate fruition was the motive for the contract, it must be done in a reasonable time. Co. Litt. 208; 2 Coke, 75, 78; Wing. Max. 463, 464, pl. 31; 5 Serg. & R. 383. If to be done on demand, a reasonable time is allowed. 1 Rolle, Abr. 443, 449; 3 Day, Com. Dig. 104. If the acts to be done are mutual or concurrent, the party who sues must aver and prove performance on his part, or an offer and readiness to do so. 2 Saund. 352, note; Doug. 691; 11 Serg. & R. 200, 352; 12 Johns. 212. Acts to be done by both parties at the same time, are deemed mutual and concurrent, though stipulated by different instruments they are one contract, one is the consideration for the other. [Morgan v. Morgan] 2 Wheat. [15 U. S.] 299; [Goldsborough v. Orr] 8 Wheat. [21 U. S.] 224. A plaintiff in equity must aver and prove the performance of those acts, which were the consideration of the contract to be enforced. [Colson v. Thompson] 2 Wheat. [15 U. S.] 344. If the promise is to an intended son-in-law that the father will make for his intended wife the same provision as he had done for his other children, the plaintiff must aver and prove what that provision was. 1 Call, 84, 89. Taking this contract then according to its terms, there was no legal obligation on Mr. Tilghman to be the first to move towards its completion, he was in no default without a request by the defendant, nor is there any case made out for equity to interfere, to carry into effect the intention of the parties, to correct any mistakes or cure the effects of any accident.

A different view of the case might be necessary, if the answer could be considered as evidence, so as to put the plaintiffs to disprove the matters set up in support of the defendant's claim, in the same manner as he is bound to do in relation to the denial of the plaintiff's right, according to the rules of equity in ordinary cases. The defendant is not in this position, in his answer he admits the receipt of money as executor, by which is bound to the extent of the charges against him; if in his answer he had averred the simultaneous payment of the sum so admitted, the whole must be taken as evidence, so as to put the plaintiff to disprove the payment. But if the payment or discharge is alleged at a different time from the receipt, or by a distinct transaction, the answer will be taken as an admission of the receipt, but not as evidence of the payment; so where the answer sets up an affirmative right or claim, as a bar to an account, or to retain the money in the hands of the defendant, he must establish it independently of his oath; so where he in his answer alleges any distinct independent fact as a bar to plaintiff's claim. 6 Johns. 559; 2 Johns. Cas. 87, 90; Gilb. Ev. 45; 4 Brown, Ch. 75; 7 Ves. 404, 587; 13 Ves. 53, 54; Amb. 589; 2 Madd. 445; 2 Eq. Cas. Abr. 247, 248; Kohne v. Ins. Co. of North America [Case No. 7,921]; 1 Munf. 395; 4 Hen. & M. 511; 1 Ves. Jr. 546. So of matter of avoidance set up by plea. Gernon v. Boecaline [Case No. 5,367]; 1 Johns. 590; 14 Johns. 74; 17 Johns. 367. An answer is no evidence as to matter not necessarily drawn out by the bill, or not directly charged, if not inquired of or forming part of the discovery sought; so where the fact inquired into is immaterial, and the answer is a departure from the question. 14 Johns. 63, 74; 1 Munf. 396, 397; 10 Johns. 544; [Leeds v. Marine Ins. Co. of Alexandria] 2 Wheat. [15 U. S.] 383; [Lenox v. Prout] 3 Wheat. [16 U. S.] 527; [Hughes v. Blake] 6 Wheat. [19 U. S.] 468; 1 Johns. Cas. 461; 1 Johns. 589, 590.

On these well established principles, I have excluded from my consideration all the allegations of the answer to which they apply, and being clearly of opinion that the defendant has not made out his claim on the merits, have not examined into the effect of the lapse of time, or the staleness of the demand. It is proper however to remark, that I adhere to the rule laid down in Baker v. Biddle [Case No. 764], and had this case required its application, it might have had a powerful if not a conclusive effect.

There must be a decree to account.

HOPKINSON, District Judge. A primary, and certainly the most important part of the discussion at the bar, has been upon the question, what was the contract of the parties? Until this is settled it would be an idle waste of time to inquire into the alleged violations. I shall therefore first direct my attention to that question; and it seems to me that if we trace this marriage negotiation from its commencement to its termination, we shall not be at a loss to discover the intention of the parties in its progress and conclusion. Legal formalities were not regarded, for the whole transaction was governed by a spirit of liberality on both sides, and conducted with that mutual confidence which the situation of the persons concerned in it, and their long and ultimate acquaintance entirely warranted.

The pecuniary arrangements for this marriage began in the conversation between William Tilghman and Benjamin Chew the elder, the precise date of which is not fixed, but we may assume that it was certainly antecedent to the proposals made by William Tilghman and accepted by the younger Mr. Chew. It has been so understood in the argument on both sides, nor have we clear and certain evidence of the agreement which is said to have resulted from that conversation. The respondent, Mr. Chew, in his answer, states that the agreement was, that his father should give him land worth 5000 dollars, and allow him annually the interest of 25,000 dollars, and that Mr. Tilghman should give his daughter, for her advancement, 30,000 dollars, and that he promised to do on this occasion whatever the respondent's father would do, and more. In the deposition of Mr. Chew the elder, he states that he told Mr. Tilghman that he would make out to his son a farm in

New Jersey which he estimated to be worth 6000 dollars, and immediately after the marriage would contribute and pay to his son 1500 dollars annually in addition. That in consequence of this general information Mr. Tilghman stated, without any great difficulty or much consideration, that he would make up the sum of 30,000 dollars for his daughter. If we were called upon to execute this agreement, there would be much difficulty in ascertaining its true meaning in a very important particular, that is, whether Mr. Tilghman intended and promised to give to his daughter the sum of 30,000 dollars from his own property, in addition to the estate which would come into her possession at his death, or whether the intention only was to anticipate, in this respect, the event of his death and put her then husband at once into the enjoyment of so much of her property. Many considerations would naturally come into the decision of this question, were it necessary to pass a judgment upon the effect of the conversation alluded to; but the subsequent proceedings of the parties relieve us from these difficulties. On the 10th of July, 1816, the day before the marriage was solemnized, Mr. Chew the younger tendered to Mr. Tilghman certain proposals in writing, we have them now before us. As they were not adopted, they are of no further consequence at this time than as they may show that Mr. Chew the younger did not suppose his marriage contract had been finally arranged and settled between his father and Mr. Tilghman, or it is difficult to assign a reason for his making proposals so different from the terms said to have been agreed upon in the conversation between those gentlemen, and without, as far as we know, any consultation or explanation with his father on the subject. The conduct of Mr. Tilghman is equally irreconcilable with an understanding on his part that this affair had been settled already; in which case his reply to these proposals would actually have been that the contract was concluded, and no longer in his power, without the assent of the parties concerned, and with whom he had contracted. So far from this was the understanding of Mr. Tilghman, that he did not make the least allusion to what had passed between him and Mr. Chew; but offers other proposals to Mr. Chew instead of his, which Mr. Tilghman thought more favourable to Mr. Chew than his own, and which certainly were so, and which were assented to in writing by Mr. Chew. In the course of this negotiation, in which proposals were made by both of these parties, and a contract finally agreed upon and signed, neither of them made any reference to any antecedent contract, but both seem to have considered the whole subject to be open to them, and entirely at their disposal. The assent of Mr. Chew the elder was not thought necessary, either to annul the former agreement or to give validity to the new one. If, however, that assent were necessary, it was afterwards fully given. Under such circumstances, I cannot but consider the proposals of Mr. Tilghman delivered to Mr. Chew the younger and by him formally assented to in writing, as the only subsisting contract between the parties; as the only contract brought before the court. The respondent has also so considered it, as in his answer this is the contract insisted upon, and for the breach of which he requires redress or compensation. In deciding upon a transaction which took place more than fifteen years ago, it is very satisfactory to have a written document for our guide, rather than the imperfect recollection of conversations, perhaps not fully and mutually understood at the time, and which now are still more uncertain and obscure. On the 10th day of July, 1816, the day before the celebration of the marriage between Mr. Chew and Miss Tilghman, the father of the lady "presented to Mr. Chew, the respondent, a paper to which the respondent gave his assent in writing." It is in the form of a letter. We must carefully scan the language used, as it was written by one who well understood the force of every word contained in it, and was remarkably precise in all matters of business. It is as follows: "As my daughter, to whom you are to be married is under age, I think proper to mention what I propose to be done after she arrives at twenty-one; and from the conversation we have recently had, I make no doubt but it will be perfectly agreeable to you. In order to raise an income we must resort to the Northampton estate, which, although valuable, is unproductive in its present state. I intend that so much of it shall be sold as will produce 30,000 dollars, of which 5000 dollars may be expended in furniture, and the remaining 25,000 dollars be placed in your hands, to be used by you as you think proper. This capital of 25,000 dollars is to be considered after your death as a debt due from your estate. If your wife survives you, she is to receive it from your estate, and if she dies before you she is to have the right of disposing of it as she pleases, either by last will and testament or any writing in nature thereof, or any other writing executed in the presence of at least two witnesses; but if she should die without making any such disposition, then after your death the said 25,000 dollars are to be distributed according to the law of Pennsylvania, in the same manner as it would be if your wife had died possessed of it and unmarried." This is the proposal, the agreement, the contract, by whatever name it may be called, on the part of Mr. Tilghman; and it seems to me to be hardly possible to raise a question upon its meaning, or even to turn it into any form of expression which will be more intelligible and explicit; but, if amplified for explanation, does it not amount to this and no more? "You are about to marry my daughter; you will require money to furnish your house and an income to maintain your family. My daughter has a real estate which is unproductive, and therefore will not furnish the

money and income you require, but it is valuable, and if sold and turned into money it will supply your wants. As she is under age, this cannot be done at present, but I propose that after she arrives at twenty-one, so much of her Northampton estate shall be sold as will produce 30,000 dollars, a part of which, 5000 dollars, shall be applied to the purchase of furniture, and the residue be a capital to produce the income you require." The agreement or proposal goes on to put this capital of 25,000 dollars precisely in the situation, as to Mr. Chew's rights, and the rights of his intended wife, as it would have been had it remained in real estate. Is there a word here which intimates even a suggestion that in any event these 30,000 dollars, or any part of them, were to be drawn from the estate of Mr. Tilghman? Is there any thing like a promise on his part, that if, from any cause, the fund which was to produce the money should fail, or the execution of his proposal be prevented, he would make it good from his own property; he would be responsible to Mr. Chew for his disappointment? I perceive nothing of this sort. That which was to be done to carry this arrangement into effect was not to be done by Mr. Tilghman; was not under his control or power. He could have no part or agency in it beyond his interest in the land to be sold as tenant by the curtesy. Indeed it has been argued at the bar, that he was not, upon strict construction of the proposals, bound to release that. I consider his proposal however as binding him to do whatever should be necessary on his part to execute that proposal, and that it would have been a breach of good faith if he had refused to unite in the conveyance of the land he proposed to sell. This is, however, no question here. It is plain that the execution of the plan or proposal agreed upon between Mr. Tilghman and Mr. Chew, depended, for its completion, upon the will and the acts of Mr. Chew and his wife, and it would be very extraordinary if Mr. Tilghman had made it the direct interest of Mr. Chew and his wife, not to execute it, by making himself responsible out of his own estate for its failure; for it is contended, that the undertaking of Mr. Tilghman that the 30,000 dollars should be raised and paid to Mr. Chew, was an absolute promise to pay so much money, to be produced by the sale of the Northampton property, if it could or should be so done, but if not so produced, to be paid by Mr. Tilghman from his own resources; in short, that the promise to raise this amount and pay it into the hands of Mr. Chew, was absolute and unconditional. If, when Mrs. Chew arrived at twenty-one, she should refuse to make the conveyance, without which the land could not be sold and the funds could not be raised, Mr. Tilghman was to answer for the default; if by unexpected events the intended sales should become impossible, Mr. Tilghman was to indemnify Mr. Chew for the disappointment. In the first case it is clear, that while, by the re-

fusal of his wife to sell, Mr. Chew would hold the possession of the estate from which the money was to come, he would also be entitled to demand from her father the money. A contract so unreasonable cannot be raised by ingenious arguments and forced constructions; it should appear to be the intention of the parties by explicit and unequivocal terms.

If this be the meaning of the contract, the question occurs, has it been defeated by any thing done or omitted to be done on the part of Mr. Tilghman? Has it failed by his default; or has its non performance arisen from circumstances not under his control, and which on the face of the contract appear to be the contingencies, known to both parties, on which its execution necessarily depended? The contract was dated on the 10th of July, 1816; Mrs. Chew became of age on the 19th of April, 1817, and died on the 16th of June of the same year; that is, three days short of two months after she attained her full age. It is expressly stated, that whatever was to be done to carry the proposals into execution, was "to be done after she arrived at twenty-one." If it could be conceded that the engagement of Mr. Tilghman was absolute, that it should be done after Mrs. Chew arrived at that age, equity would nevertheless give a just and reasonable construction to the words which designate the time of performance; and by looking at what was to be done, ascertain the period of performance, after which a default would be adjudged. The words are, "I think proper to mention what I propose to be done after she arrives at twenty-one." It can hardly be contended that the responsibility of Mr. Tilghman, whatever it was, that this should be done, attached on the moment his daughter arrived at twenty-one; and if this were not the case, but a reasonable time will be allowed for performance, we must find that reasonable time in the nature of the acts to be performed. Here, too, we have the written document for our information and guide. The money to be raised was to be procured by a resort to the Northampton estate; so much of which was to sold as would produce 30,000 dollars. Can we imagine that it was the expectation or intention of either of these parties that this large sum could be raised from these sales in the short space of two months; and that there was a default in Mr. Tilghman in the performance of his contract because it was not done? Again, it was undoubtedly in the option of Mr. and Mrs. Chew, when she came of age, to go on to make the sales of land according to the proposal and previous intention, or to retain the land and look to that, or to other resources, for the required income. On the part of Mr. Tilghman, nothing could be done in execution of the proposals, but to release his interest in the land, as tenant by the curtesy, and there is no proof or allegation that he ever refused to do this; that he was ever asked to do it, or that its not having been done form-

ed any impediment, delay or disappointment in making the sales, in raising the money or in defeating, in any respect, the execution of the proposals of the 10th of July, 1816. If this be so, the failure in the completion of the design cannot be traced, in the smallest degree, to Mr. Tilghman, by his doing or omitting to do any thing contrary to his proposals, even if they may be considered as a contract. This design was defeated by the afflicting death of one of the parties whose co-operation was indispensable; and it was fully in the view of the respondent, that it could not be executed if that event should happen; and of course the whole arrangement, the whole plan for raising this money, would necessarily fail if this event should take place before it could be completed. I may add, that the object and intention of raising it also failed on the death of Mrs. Chew.

In my opinion, Mr. Chew, the respondent, has not established his right to retain any part of the funds or estate of his testator, William Tilghman, in satisfaction or on account of any claim or demand he has against that estate by reason of any contract, matter or thing set forth in his answer.